## GEORGE ALFORD *v.* THE STATE.

1. "OFFICERS." — The Code of Criminal Procedure, art. 44, enumerates all
   the peace-officers known to the law of the State, and as it names no such
   an officer as a " deputy-marshal" of a municipal incorporation, no such
   a functionary is an officer of whom judicial cognizance can be taken by
   this court.

2. SAME. — A quondam bailiff of a grand jury has no official *status* or author-
   ity after its adjourment *sine die;* and to constitute a deputy-sheriff, the
   appointment must be in writing, and the appointee, before entering on his
   duties, must qualify and otherwise comply with the requirements of art.
   4520 of the Revised Statutes.

3. ARREST. — No person other than an officer can make an arrest, except for a
   felony committed in his presence or within his view, unless he is specifi-
   cally appointed by a magistrate to execute a particular writ, or is sum-
   moned by an officer on a *posse comitatus.*

4. WARRANT OF ARREST. — In accordance with the constitutional guaranty
   against unreasonable seizures or searches, the Code of Procedure enacts
   that a warrant for arrest, and also the complaint on which it issues, must
   specify the accused's name, if known, and if his name be unknown, must
   give a reasonably definite description of him.

5. SAME. — A fictitious name cannot be assigned to the accused in lieu of his
   real name, nor can the officer charged with the execution of the warrant
   interpolate in it the true name of the accused. Neither can a warrant be
   held valid because the person arrested under it, though described neither
   by name nor otherwise, proved to be the person against whom the com-
   plaint was intended.

6. RIGHT OF RESISTANCE. — Unlawful arrest is a continuous assault, of an
   aggravated character, and the right of resistance thereto is not limited to
   the time at which it is attempted or accomplished, but continues through-
   out the unlawful detention, and may be exercised not only by the person

unlawfully detained, but by another in his behalf, and with the force requisite to effect the release of the person so detained. Homicide resulting from the use of such force is not culpable.

7. Same.— In determining whether or in what degree a homicide so committed is culpable, the lawfulness of the arrest, not the information of the accused respecting its legality, is a controlling criterion, in connection with the character of the means used to effect the arrest, upon the one hand, and those used to resist it upon the other. Note the exposition of this subject in the opinion, and the collocation of the provisions of the Code of this State involved in its consideration.

Appeal from the District Court of Tarrant. Tried below before the Hon. A. J. Hood.

The appellant and Mace Alford and William Lytle were jointly indicted for the murder of George White, on August 2, 1879, by shooting him with a gun. Upon the separate trial of the appellant he was found guilty of murder in the second degree, and his punishment assessed at a term of five years in the penitentiary.

In the " short, sharp, and decisive " affray of which this record gives a brief account, and in which six men were engaged, the " casualties " footed up two killed and at least one wounded. A peculiarity of the case is that one of the men killed was William Lytle, and that he is included in the indictment.

A short time previous to the encounter, one John Shaddy, having found a certain stolen mare in the possession of C. McCafferty, at Fort Worth, claimed her to be the property of one Storm. McCafferty had bought the mare, but could not tell Shaddy the name of the man from whom he bought her, and Shaddy made sworn complaint against " John Smith " as the thief, intending the complaint, as he testified, " for the man McCafferty got the mare from." In conformity to the complaint, the warrant of arrest issued for " John Smith," and in that condition was delivered for execution to George White, the deceased, who claimed to be a deputy-sheriff of Tarrant County and a deputy-marshal

of the town of Fort Worth.   After White was shot, it was
discovered that the name " Thomas Olferd " had been
bracketed into the warrant after the fictitious name of John
Smith ; and one witness testified that the interpolation was
in White's handwriting.   McCafferty, after the issuance of
the warrant, learned that Thomas Alford was the name of
the man from whom he had bought the mare, and wrote to
him at Arlington, a village near which the Alford family
lived.    Thomas  Alford  soon  came  to  see  McCafferty,
showed a bill of sale to him of the mare, and told McCaf-
ferty not to give her up without good proof of Storm's
ownership, promising to " make it all right " with Mc-
Cafferty in case she should be " proved away " from him.

McCafferty surrendered the mare on the claim and proof
made by Shaddy in behalf of Storm, and then, accompanied
in his buggy by White, proceeded to Arlington for the pur-
pose of getting indemnification from Thomas Alford,—White
professing a mission of his own at Arlington.   Upon reach-
ing Arlington they there met Robert Alford, the father of
Tom and the appellant, and from him learned where they
could find Tom Alford.   White, abandoning his own pur-
pose, accompanied McCafferty to Robert Alford's, and there
they found George Alford, the appellant, who told them he
lived at Tom's, was going there, and would show them the
way.   The appellant, mounted on a " blue roan horse,"
went with them to Tom Alford's.   There the horses were
put up and fed, and McCafferty and Tom Alford, while the
defendant was getting dinner for the party, adjusted their
business by Tom Alford giving McCafferty a horse in place
of the mare reclaimed by Storm.   The horse was " out,"
and Mace Alford, a younger brother of Tom and the appel-
lant, was sent for to get the horse.   About the time the
horse was brought up and McCafferty and White ready to
leave, Marion Stowe and Mitch Harrison came, each having
a gun.   McCafferty asked Tom Alford to ride the horse a
short distance, to see if he would pitch.   Tom did so, and

Mace Alford also started with them, leaving at the house Stowe, Harrison, William Lytle, and George Alford, the appellant. After riding the horse about a quarter of a mile, Tom Alford said that he was gentle and would not pitch, and that he would go back; and at White's request he took the saddle off the horse and put it on a horse White had along. White then told Tom Alford that he (White) was a deputy-sheriff, and had a warrant for him, and to consider himself under arrest and come along. Tom said he would do so if White would go with him back to the house, so that he could get some clothes. White refused to do so, and Mace Alford became excited, drew his quirt, and started at White, who drew his pistol and told Mace to stop or he would blow the top of his head off. Mace then left, saying to White, " Young man, you'll pay for this," and to Tom, " You shall have your clothes, and don't you forget it." Mace Alford rode off rapidly. Then McCafferty and White tied Tom's hands, put him on White's horse, tied his feet together, fastened the new horse to the saddle, and, with White's horse tied to the buggy, they started on. McCafferty, from whose testimony this statement is taken, gives the following account of the subsequent proceedings : —

" We had got about six hundred yards when we heard some one behind halloo ' Halt,' and the horse Tom was on broke loose from the buggy, and Tom started back. White jumped out on the right; I on the left. White hallooed ' Halt.' Some one said, ' Shoot him, Mace.' At this time the shooting began ; it was so near at the same time that I could not tell who shot first, — White or the other party. I was holding the buggy-horse, which made several lunges, but was not very hard to hold. My attention was mostly directed to the shooting then going on. I saw Lytle and Mace Alford and George Alford, the defendant, there. I had never seen any of the Alfords until that day, except Tom Alford. The parties were all on the right side of the road, but at the first fire I saw Lytle reel in his saddle, and

he crossed over to the left side of the road.  Lytle and Mace Alford were in front, about forty steps off, and nearer to White ; defendant was some five steps further off.  Lytle had a gun ; the others had pistols.  Mace Alford rode a gray pony, Lytle rode a black horse, and defendant a blue roan, when they caught up with us.  White kept shooting until the others all went off into the bushes.  White and I then got into the buggy and went down to old man Alford's, and called for some water, which the old man brought out.  We drank.  The old man asked us what was the matter, and we told him we had had a little shooting-scrape with the boys.  After drinking, we went on to Arlington."

The witness got out warrants at Arlington for the arrest of the Alfords and Lytle.  White had but one pistol, which was a six-shooter.  He was shot by the man who had the gun (Lytle), and died five or six days afterwards.  McCafferty admitted that an indictment against him for horse-stealing had been dismissed by the county attorney.  His testimony does not show whether he was cognizant of White's purpose to arrest Tom Alford before that was done, nor whether they had decoyed him from his home for the purpose of effecting the arrest without interference.

Two days after the affray an examining court was held, and George Alford, the appellant, was present in person and by attorney.  White testified at that investigation, and his testimony having been then reduced to writing, was introduced by the State at the trial in the District Court.  This testimony concurs, in substance, with that of McCafferty, but gives a more distinct report of the operations subsequent to the arrest of Tom Alford, as follows : —

" I put Tom Alford on the horse, and tied his hands and feet.  We started down.  I told Charley (McCafferty) to drive up as fast as he could, for I was satisfied they would try to take him away from us.  We hadn't gone more than a quarter of a mile from there before I saw them coming.

I think probably Tom Alford must have seen them first; because the first I noticed of it, Tom jerked his horse back and made him break loose. Tom's horse was hitched to the back of the buggy in which Charley and I were riding. At the same time I demanded of Tom to stop, and jumped out of the buggy. When I jumped out, Tom hallooed, ' Shoot him, Mace, — shoot him.' About the same time the defendant (George Alford) stopped behind a tree, between thirty and forty steps off. Mace Alford and the other man came up about five steps closer. About the time that Tom hallooed ' Shoot,' they both fired. The three men who rode up were Mace Alford, George Alford, and the man who got killed (Lytle). I couldn't tell which fired first. The man that got killed had a gun; the other two had pistols. The one that had the gun shot me. About the time I was falling I shot at him; as I shot, he fell off his horse. As soon as I could I shot at the other one, — that is, Mace Alford. I fired a second shot at Mace Alford; he then fell almost off his horse. The next shooting I did was at George Alford, behind the tree; which was two shots. I then turned to Tom Alford; he was on my horse, going off, about fifty or sixty steps away. I had got up on my feet by that time, and as I turned I fell, and fired at him at the same time. While I was down I shot at him again,— the only shot I had in my pistol. They all left; I then got in my buggy and started to town." White had never seen appellant prior to that day.

Dr. Beall, for the State, testified that he was called to see White the night succeeding the mêlée, and found him in a critical condition, having received twenty-five or thirty shot in his groins and lower abdomen. During that night the defendant, George Alford, was brought before White, who looked at him and said, " That's one of the roosters that . shot me." Defendant replied, " You are mistaken; I was not there." White said, " I fired my two last shots at you as you ran off through the bushes." Previous to this

interview between the defendant and White, the latter told
his mother he thought they had killed him, and had repeat-
edly spoken as though he did not expect to live. Witness
had gone to White's room to apprise him that George
Alford would be brought before him for identification, but
before he got there the defendant had been taken in
there.

R. C. McPhail, White's step-father, testified that he was
present when the defendant was brought before White, and
that White did not know the defendant was to be brought
there. Concurring with Dr. Beall as to what passed be-
tween White and the defendant, the witness further stated
that the warrant for the arrest of Tom Alford was handed
him by White, and that the interpolated name " Thomas Ol-
ferd " was in White's handwriting, which was well known
to witness. White had been acting as a ·deputy-sheriff and
as deputy-marshal of Fort Worth.

A. G. McClung, the justice of the peace who issued the
warrant, testified that " John Smith " was the only name
in it when issued, and he did not know by whom the inter-
polated name was subsequently inserted.

The State then put in evidence the warrant of arrest
and the sworn complaint of Shaddy on which it was issued,
and the case for the State rested here. The character of
the complaint and warrant are sufficiently indicated in the
other evidence.

For the defence, Mitch Harrison testified that he and
Marion Stowe had agreed to go with Mace Alford on a
squirrel-hunt the evening of the affray, and for that purpose
took their guns with them to Tom Alford's, where Mace
had gone for the purpose of getting up a horse. They put
their guns down by Tom Alford's gate. McCafferty and
White insisted that Tom Alford should ride the· horse he had
let McCafferty have, to see if he would pitch. Tom agreed
to do so, and put White's saddle on the horse, and he and
Mace went off with White and McCafferty. Witness,

defendant, Stowe, and Bill Lytle remained at Tom's house. Before long, Mace Alford came back, went into the house, and called Bill Lytle in with him. In a few minutes they came out, Mace bringing some clothes under his arm. They picked up the two guns at the gate, mounted their horses, and started off. Mace rode a gray pony and Lytle a black horse. As they were about starting, the defendant asked them what was up; to which Mace replied that those fellows had arrested Tom, and they were going to take him his clothes. Mace did not seem excited or angry, and defendant did not appear excited, and asked no further questions. Mace and Lytle galloped off down the road, and witness, with the defendant and Stowe, remained at Tom Alford's, and were standing at the gate when they heard the firing. They stayed there until Tom and Mace Alford came galloping back and told them that White had shot Bill Lytle badly, and they had left Lytle in the edge of the bushes near where he was shot, and that witness and his companions must get a doctor for Lytle and take care of him. Witness and the defendant got their horses and started to find Lytle and get him a doctor, the defendant riding his old blue roan horse. Marion Stowe started home. Witness and the defendant went on towards where the shooting took place, and on the road met Mrs. Alford, the defendant's mother, who was on her way to Tom's. They next met Mr. and Mrs. Hope, in a wagon. Not finding Lytle where they expected, they kept on to old man Alford's, who told them to go back and find Lytle before going for a doctor, as he might be dead or be up and gone, and need no doctor. They went back and found Lytle in the bushes. Defendant stayed with Lytle and witness went for a doctor, and in three or four hours returned with one, and then they moved Lytle to old man Alford's, and he died there about one o'clock that night. A constable and a deputy-sheriff came there the same night, and after Lytle died they arrested the defendant.

Marion Stowe, for the defence, concurred entirely in the

testimony of Harrison down to their separation, when witness started home and the defendant and Harrison went to look for Lytle. On cross-examination, he denied that he had told Mrs. Bowlin, the evening of the affray, that he would have been in Lytle's place if Lytle had not jerked his gun out of his hand and swore he would go, or that he had further told Mrs. Bowlin that there were "three of us to go, and only two guns and one pistol."

Constable O'Neal, for the defence, testified that about ten o'clock in the night of the affray he went to old man Alford's with a warrant for the arrest of Lytle and the Alford boys. After Lytle died, witness arrested the defendant, who then piloted witness three miles through rough woods and by narrow paths, and made no attempt to escape.

Mr. and Mrs. Hope, for the defence, corroborated Harrison's statement that he and the defendant met them when on their way to seek Lytle.

Mrs. Alford, the mother of the defendant, also corroborated Harrison's statement about meeting her on her way to Tom's. She stated that Tom Alford was wounded.

Robert Alford, father of the defendant, corroborated Harrison's testimony about what passed between witness, Harrison, and the defendant at witness's house, when the two latter were going for a doctor.

J. M. Henderson, sheriff of Tarrant County, testified that he placed in White's hands the warrant for John Smith, and told him to execute it, but gave him no written authority to do so. Witness had never appointed White a deputy-sheriff, but at one term of the District Court he had him sworn as a special constable to wait on the grand jury. When witness gave to White the warrant for John Smith, the name of Tom Alford was not in it.

Tom Ditto, for the defence, stated that he had known the Alford boys for years, and that the defendant and Mace were nearly the same size and very much alike, though defendant is the elder and a little the larger of the two.

Witness could tell them apart, but it would be difficult for a stranger to do so. This closed the evidence for the defence.

The State, in rebuttal, introduced Mrs. Bowlin, who testified that she lived about half-way between old man Alford's and Tom's. She heard the shooting when White was killed, and immediately afterwards heard three or four voices in that direction, and soon saw Tom and Mace Alford come galloping by, going towards Tom Alford's. She also saw Mitch Harrison pass by, going to old man Alford's from Tom's. If the defendant was with Harrison she did not see him, and thought she would have done so if he had been along. Not long after Harrison passed, the defendant came to her house and asked for water for a wounded man. She gave him some water, and then got more water and went herself to find the wounded man. Finding the defendant's horse, she called him and he answered, and going to him, she found him waiting on Lytle. That same evening Marion Stowe was at her house, and told her that he came near being in the fight himself; but that there were three to go, and only two guns and one pistol, and Lytle jerked his gun out of his hands and swore he would go.

S. M. Farmer, city marshal of Fort Worth, testified that White, at the time of his death, was a deputy-marshal of Fort Worth, regularly sworn in. This concluded the evidence in the case.

The defence reserved a number of exceptions to the evidence adduced by the State, and especially to the testimony relating to the charge of theft against Tom Alford, the warrant for the arrest of John Smith, and the pretence that White was a deputy-sheriff. The jury were explicitly instructed by the court that the accusation against Tom Alford could not affect or prejudice the defendant. No instructions were given respecting the legality of the warrant or of the arrest, nor the right of resistance to illegal arrests.

*Edward Hovenkamp, J. M. Thomason,* and *H. M. Furman,* for the appellant.   In this case the defendant should have been acquitted on the defence of *alibi.*

Mace Alford, who was present and participated in the shooting, so nearly resembled his brother, the defendant, that strangers could scarcely tell them apart.   McCafferty and White had never seen either Mace or George Alford before the day of the difficulty.   Knowing that they had just left George Alford at Tom's house, they would naturally expect to see him in the rescuing party; and owing to the remarkable resemblance between George and Mace, and the excitement of the moment, it would be a natural error for them to fall into, to think that they saw George Alford present.

White was certainly mistaken in his evidence.   He mentions the number of shots he fired, and at whom they were fired, making seven in all; yet McCafferty says he had only a six-shooter.   Again, before Esquire Brinson, on the preliminary trial, White swore that he had fired his last two shots at Tom Alford; but when he identified George Alford as one of the rescuing party, he stated that he fired his last two shots at George Alford.

The defence of *alibi* was clearly and positively made out by Stowe and Harrison, two witnesses who knew the parties well, and who had no motive to testify falsely.   It was only by accident that they were in a position to know what they did.   They are corroborated in every instance in which they refer to circumstances of which other persons were cognizant.   Two unlearned country boys could not concoct a story of this kind in a moment, which would be so fortified by circumstances and by other witnesses.   It is respectfully submitted that, under the peculiar circumstances of this case, the defendant's conduct is incompatible with the idea of guilt.   A failure to fly is not always evidence of innocence; but look for a moment at the circumstances of this case.   George Alford is a poor boy; he has no wealth, or

family ties to keep him.   He has no social position, or influential friends to screen and protect him.   If guilty, he would have known that McCafferty had seen him ; that White, though perhaps mortally wounded, would make a dying declaration and identify him.   He would have known that he would be unable to give bond, and would have to go to jail.   He knew, as every other man in the county knows, that conviction and heavy punishment is the rule, and that but few persons come clear before Tarrant County juries.   There was every inducement, if guilty, why he should not have remained.   He acted just like an innocent man would have acted under the circumstances.

We think it clear, by both statutory law and constitutional provisions, that no citizen can be deprived of his liberty except in the manner pointed out by law.   It is not pretended that White was attempting to arrest Tom Alford for an offence against the public peace, or for a felony committed in his presence.   We are therefore to test the legality of the arrest by the law regulating and authorizing arrest under warrant.   There is no law which authorizes sheriffs to appoint deputies and confer upon them the great and responsible duties of their positions verbally.   This is the only authority which White acted under.   There is no law which authorizes a deputy-sheriff, private citizen, or any other person, to insert any name which he sees fit into a warrant which has been signed, sealed, and issued for the arrest of another person.   This is the only kind of warrant White had.   The conclusion, then, seems irresistible that the arrest of Tom Alford by White was illegal.

The question then arises, To what extent, if any, can a citizen resist an unlawful arrest?   The liberty of the citizen is a sacred thing in the eyes of the law.   Individual liberty and freedom are the great ideas upon which our political fabric is founded, and for the promotion and protection of which our laws are enacted.   It is the birthright of every American citizen.   He can only be deprived of it in a cer-

tain manner.  When a citizen submits to lawful arrest, he does so without subtracting from the dignity of his character as a free man.  On the contrary, in so doing he pays a compliment to the idea of self-government; for he manifests a willingness to submit his case to laws which he participated in making, and which he knows to be just and impartial.  It is, therefore, as it should be, the boast of every good citizen that he is a law-abiding man.  But the duty of submission ceases with the lawful authority to command it.  The officer clothed with the majesty and power of the people's will, when in the line of duty, should be obeyed; but the irresponsible volunteer, without lawful process, stands in an entirely different attitude.  Let it be known to the people that their liberty has become so cheap in the eyes of the law that any one of them can have his name inserted into a warrant issued for another man, by an irresponsible person, can then be tied hand and foot, like Tom Alford was by George White, and then, that if the party so arrested either attempts himself, or his friends or brothers attempt for him, to resist this outrage, that he or they will become criminals in the eye of the law, that professes to protect liberty, — let this doctrine be once established, and the law will lose its hold upon the confidence and the affections of a brave and a free people.  If constitutional and legislative provisions are to be held at naught and trampled upon, as they have been in this case, why have such provisions at all?  Why not leave it entirely discretionary with sheriffs, and persons who at any time may have been sworn in as "bailiffs to wait on the court," to arrest whom they please, just how and when they please?  It seems to us that the latter course would be the most consistent.

The view which the learned judge who tried this case seemed to take of it was, that if resistance had been made at the time the arrest was attempted, then the case might stand in a different attitude, but that as the resistance par-

took more of the nature of interference, or rescue, after the arrest was complete, then the questions now presented to the court could not avail.   We must confess that we are at a loss to see the force of a distinction of this kind.   If the arrest was illegal at its inception, it seems to us that it was illegal during its entire continuance.   Did the forced submission of Tom Alford confer legal authority on George White?   Did the fact that George White tied Tom Alford hand and foot render proper and legal what at first was a usurpation?   It seems to us that the only consistent view with which it can be contended these parties did not have the right to rescue is to take the ground that they would not have had the right to resist at the beginning.   This position would also include the idea that Tom Alford did not have the right, either to resist the arrest in the first place or to free himself from it during its continuance.   If he had the right, then others could exercise it for him.   This proposition cannot be denied without disregarding the uniform current of authorities, for the general rule is that whatever one may do for himself, he may do for another. The converse of the rule is equally as elementary and well established, viz., whatever one may do for himself, others may do for him.   We therefore hold that the parties who rescued Tom Alford stand in the same attitude that Tom Alford would have been in had he, by himself, effected his own release, and in so doing killed George White.   Would he have been guilty of murder?   We submit not.   See Roscoe's Criminal Evidence, seventh edition, p. 757, for a full discussion of this question.

Tom Alford had been arrested at the point of a sixshooter, when there was no possible chance for successful resistance, and when he could only choose between death and submission.   His arrest was effected on a warrant partly of White's own unauthorized and unlawful manufacture. White had no official character to protect.   He was guilty of false imprisonment.   When Alford's friends came up to

rescue him, White showed fight, jumped out of the buggy with a drawn pistol in his hand; his manner, previous conduct, language, and the means he then possessed, manifested a present purpose and ability to kill Tom Alford, or inflict serious bodily injury upon him, if he did not submit to his unlawful arrest. McCafferty says they fired so near together that he could not tell who fired first. Tom Alford was not bound to obey. He had the right to go, and if he was forced by White's unlawful course to either submit to false imprisonment, or kill White to save his own life, then, under our law, and upon reason, we hold that Tom Alford, or others acting for him, had the legal right to kill White, and that in so doing they are not guilty of any offence.

*W. B. Dunham*, for the State.

CLARK, J.   Assuming that the appellant was present, and a participant in the *rencontre* which resulted in the death of the deceased, as found by the jury, several questions present themselves in the record, an affirmative answer to each of which is important in determining the validity of the present conviction. These questions may be stated as follows : —

1. Was the deceased, White, an "officer" within the contemplation of law, and authorized by law to execute the warrant of arrest as attempted?

2. Was the warrant in his possession of sufficient validity in law to authorize the arrest of Thomas Alford, the appellant's brother?

3. Was it incumbent upon Thomas Alford and his brothers to submit to the arrest and asportation of the former, as attempted? and, if the arrest was without authority, was the homicide of the deceased necessarily murder?

That the deceased was not an officer, can hardly be gainsaid. All peace-officers known to the law are carefully

enumerated in the Code, and no such officer as a deputy-marshal of an incorporated town or city appears. Code Cr. Proc., art. 44. It may be that the charter of the city of Fort Worth provides for such officer, but if that be the fact it is not so made to appear in the record. Nor was the deceased a deputy-sheriff of the county. The mere fact that at a previous term of the District Court for the county he had been appointed and had acted as bailiff to the grand jury invested him with no continuing authority as a peace-officer after the adjournment of that body and the cessation of the functions for which he had been constituted. To constitute a deputy, in law, the appointment must be in writing, and thereupon must be indorsed the appointee's oath of office, taken before he enters upon the duties of his office, and the instrument of appointment, thus indorsed, recorded and deposited in the office of the clerk of the County Court of the county. Rev. Stats., art. 4520. Without these formalities there can be no legal deputation, and the party assuming to act in their absence divests himself of many important privileges in cases of collision, and awards to a party whom he may seek to arrest some advantages of which he would be otherwise deprived. And it is time this feature of the law should be understood and regarded by those charged with the execution of criminal process.

The liberty of the citizen is as important as the interests of society. In fact, it is one of the fundamental purposes proposed to be subserved by the organization of society and government. The law provides the instrumentalities by which the personal liberty of the citizen may be restrained, temporarily or permanently, in the interests of society, and these exact instrumentalities must be evoked in case it be sought to effect such deprivation. No person other than an officer can make an arrest, unless a felony or breach of the peace is committed in his presence or within his view, or unless he be specially appointed by a magistrate to

execute a particular warrant, or is summoned to the aid of
an officer, as a part of the *posse comitatus.*

But, conceding that the deceased was an officer, was the
warrant in his possession of sufficient validity to authorize
the arrest of Thomas Alford, the brother of appellant?
The affidavit made by Shaddy before the county attorney
charged one John Smith with the offence of horse-stealing,
and upon this complaint a warrant issued for the arrest of
John Smith. When this warrant is next seen, after the
*rencontre,* it is found that some one, presumably the de-
ceased, had interpolated the name of "Thomas Olferd"
after the name of John Smith, in brackets, and upon this
warrant, as altered, the arrest of Thomas Alford was pro-
posed. The name of Thomas Alford was not in the warrant
when handed to the deceased for execution. Shaddy testi-
fied that at the time he made the affidavit he did not know
that Thomas Alford was the name of the man who had sold
McCafferty the stolen horse, and that he intended the com-
plaint as against that man.

Our Constitution provides that "the people shall be secure
in their persons, houses, papers, and possessions from all
unreasonable seizures or searches, and no warrant to search
any place or to seize any person or thing shall issue with-
out describing them as near as may be, nor without proba-
ble cause, supported by oath or affirmation." Art. 1, sect.
9. Our laws are framed in accordance with this mandate,
and carefully provide for the exercise of this right of per-
sonal seizure. The complaint must state the name of the
accused, if known, and, if not known, must give a reason-
ably definite description of him; and the warrant of arrest
must specify the name of the person whose arrest is ordered,
if it be known, and if it be not known, then some reasonably
definite description must be given of him. Code Cr. Proc.,
arts. 233–236.

It is hardly necessary to say that these organic and stat-
utory provisions were wholly disregarded in the case at

bar. There is no pretence that the magistrate, in issuing the warrant, intended to authorize the arrest of Thomas Alford; and the statement of Shaddy, who made the complaint, as to his intentions, was wholly immaterial. If he had desired to procure the arrest of Thomas Alford, and by the exercise of reasonable diligence could not ascertain his name, then it was his duty to have ascertained some reasonably definite description of him, and to have fully informed the magistrate or county attorney, at the time of preferring the complaint, as to the identity of the party whose arrest was desired, in order that such description might have been incorporated in the warrant, for the information and protection of the officer who should be called upon to make the arrest. A warrant for the arrest of John Smith does not authorize the arrest of Thomas Alford, or any other person except John Smith; and it is needless to add that if the name of Thomas Alford was inserted without authority, and after the issuing of the process, such interlineation was a fraud and the process a nullity. 2 Archb. Cr. Pr. & Pl. 242; 1 Hale's P. C. 465; Roscoe's Cr. Ev. 698; *Rafferty* v. *The People*, 69 Ill. 111; 1 East's P. C. 110, 111. If the complaint and warrant had specified the accused as a person whose name was unknown, but who, for purposes of convenience, was styled John Smith, and who was the vendor of a certain stolen horse sold to one McCafferty on a certain day, or if a physical description of Alford had been set out, or other reasonably definite description, then the warrant might have been available for the purposes intended. As it was, it was wholly void, either as a justification for or protection in the arrest of Thomas Alford.

The warrant of arrest being a nullity, our remaining duty is to determine the extent to which Thomas Alford was authorized to carry his resistance, and how far appellant (his brother) was authorized to extend aid in effecting his liberation, coupled with a further inquiry as to the degree of culpability attached to the homicide resulting from such re-

sistance and liberation. And here we approach a field of
legal inquiry which cannot well be styled a *terra incognita*
in the law, and yet, by reason of the embarrassments inci-
dent to a protection of personal liberty, on the one hand,
and the due conservation of the officers of the law on the
other, it cannot be said that its limits are exactly defined,
or that further explorations are relieved altogether of diffi-
culties.

It may be safely said that to a just and reasonable extent
the right of resistance to illegal official action is essential,
not merely to all free government, but to any government
whatever. Even in despotic Rome this right was repeat-
edly and unreservedly recognized, and if there was no juris-
diction and authority in the officer, then the terse command
issued, "*vim vi repellere licet.*" At the time the common
law took shape, feudalism was the true governmental model,
and implicit obedience to all in authority was exacted; and
the decisions in those early days inculcated the doctrine
that when officers of justice transcended their powers, the
remedy was not resistance, but submission, and subsequent
appeal to the law for redress. Whart. Cr. Law., sect.
1288. At an early day, however, important modifications
seem to have been engrafted upon the doctrine of official
infallibility and absolute non-resistance to official authority,
and from the decision in *Tooley's Case*, 2 Ld. Raym. 1296,
which was decided in the eighth year of the reign of
Anne, it has been generally conceded, without much appar-
ent reason, that if an officer or other person attempts an
arrest of the subject or citizen, without lawful authority,
and is slain in the attempt or after the arrest is made, the
homicide is manslaughter and not murder; and it is indif-
ferent whether the slayer knew of the unlawful character of
the proposed arrest or not, provided that fact was developed
upon trial. The Tooley case has received much adverse
criticism, notably from Foster, in his Discourses; but these
criticisms relate chiefly to the power of interference by en-

tire strangers in behalf of a prisoner already in confinement, and concede the lawfulness of such interference by a fellow-servant, friend, or brother of the person incarcerated.

The general principle enunciated above has withstood all criticism, and is regarded as the common law in England and in most of the American States. *Rex* v. *Curvan*, 1 Moo. C. C. 132; *Rex* v. *Thompson*, 1 Moo. C. C. 80; *Rex* v. *Phelps*, 1 Car. & M. 180; *Rex* v. *Patience*, 7 Car. & P. 775; 1 Hale's P. C. 457; 1 East's P. C. 310; *Tackett* v. *The State*, 3 Yerg. 392; *The Commonwealth* v. *Carey*, 12 Cush. 246; *Roberts* v. *The State*, 14 Mo. 146; *Rafferty* v. *The People*, 69 Ill. 111; *The State* v. *Belk*, 76 N. C. 10; 2 Archb. Cr. Pr. & Pl. 242; Roscoe's Cr. Ev. 698; Whart. on Hom., sect. 227. And the same principle has been recognized by this court. *Goodman* v. *The State*, 5 Texas Ct. App. 349; *Johnson* v. *The State*, 5 Texas Ct. App. 47; *James* v. *The State*, 44 Texas, 314.

In treating of the prevention of offences by the act of a private person, our Code of Criminal Procedure provides as follows: —

"Art. 80. The commission of offences may be prevented, either —

" 1. By lawful resistance; or, —

" 2. By the intervention of the officers of the law.

" Resistance to the offender may be made as hereinafter pointed out, either by the person about to be injured, or by some person in his behalf.

"Art. 81. Resistance by the party about to be injured may be used to prevent the commission of any offence which in the Penal Code is classed as ' an offence against the person.'

\*     \*     \*     \*     \*     \*     \*

"Art. 83. The resistance which the person about to be injured may make, to prevent the commission of the offence, must be proportioned to the injury about to be inflicted.

It must be only such as is necessary to repel the aggression.

"Art. 84. If the person about to be injured, in respect either to his person or his property, uses a greater amount of force to resist such injury than is necessary to repel the aggressor and protect his own person or property, he is himself guilty of an illegal act, according to the nature and degree of the force which he has used.

"Art. 85. Any person other than the party about to be injured may also, by the use of necessary means, prevent the commission of the offence.

" Art. 86. The same rules which regulate the conduct of the person about to be injured, in repelling the aggression, are also applicable to the conduct of him who interferes in behalf of such person. He may use a degree of force proportioned to the injury about to be inflicted, and no greater."

These provisions having been declared to be in entire harmony with the spirit of the common law (*Stockton* v. *The State*, 25 Texas, 772), we might well pause at this point in our investigation, with the declaration of the common-law principle hereinbefore announced, which was not regarded in the trial below. But inasmuch as these articles are directly applicable to the case at bar, and furnish, in a greater part, the principles by which the appellant's guilt or innocence is to be determined, it becomes essential to determine their proper construction as applicable to the facts before us, and as furnishing rules for guidance in cases of this character that may hereafter arise.

A person threatened with the commission of any offence classed as an " offence against the person " (and unlawful arrest or false imprisonment is thus classed in the Penal Code) is invested by law with two remedies. He may appeal to the law for redress, by application for *habeas corpus* or some other appropriate remedy, and ordinarily this is practicable, and by far the safer and better course.

But occasions may arise in which the injured party, or party about to be injured, may be remediless at law, or the exigencies of the situation may not admit of the delays necessary in making an appeal to the law. He may know, or have good reason to believe, when his person is forcibly seized, that his captors intend to murder him, or to abduct him beyond the limits of the State, or to conceal and detain him indefinitely for the purpose of exacting ransom. In these and similar cases an appeal to the law is not practicable or feasible, and the person assailed may resort to his right of resistance, either at the time of his caption or subsequently and pending his detention; for an unlawful arrest is regarded in law as a continuous assault of an aggravated nature. Hor. & Thomp. on Self-Defence, 714. The right of resistance is not limited to the actual caption, because it may not be available at the time the seizure is made, by reason of surprise, or ample preparation upon the part of the aggressors, which would render it imprudent then to attempt its exercise. It continues to the cessation of the unlawful detention, and the party detained, or any other person in his behalf, is, under such circumstances, authorized to use all the force adequate to resist the aggression and to effect the liberation, even to the extent of taking life, if that be essential; and a homicide perpetrated for that purpose alone cannot be regarded as culpable.

Again, if a person threatened with arrest, or actually seized, knows or has just cause for belief, or is willing to act upon the assumption, that the arrest contemplated or perfected is without authority of law, and, under the immediate influence of sudden passion arising from that cause alone, he slays the aggressor, and it be demonstrated subsequently that his knowledge was accurate or his belief well founded, and that the person attempting his arrest had no lawful authority for so doing, then such cause must be deemed adequate in law, and the offence could only be manslaughter. And this is so although the arrest is attempted

in a manner free from violence or the exercise of harsh measures in effecting it. If these are used to an unnecessary or inhuman extent, the homicide might be justifiable. And, of course, any person interfering in behalf of the injured party, and actuated by the same motive and passion, could not be held amenable to a higher grade of culpable homicide. Neither might be altogether justifiable, for the force used may have been out of proportion to the injury inflicted, and neither the life nor person of the injured party so seriously or immediately jeopardized as to prevent an efficacious appeal to the law; in which case, out of tender regard for the right of personal liberty and its vindication even to an undue extent, the law looks not with severity upon the act, while at the same time a due regard for human life requires that the perpetrator be held not entirely blameless. 2 Bishop's Cr. Law, sects. 647, 656.

If, however, it should be developed that the person attempting or making the arrest was a lawful officer, and known to be such to the party arrested or to be arrested, and was authorized by law to make the arrest, and he was slain in the discharge of his duty by the latter, or by some other person who interfered in his behalf, then the offence would be murder of some degree, according to the other accompanying circumstances, as would also be the case in most instances, whether his official capacity was known or unknown; for the adjudged cases lead necessarily to the conclusion that the grade of the homicide must be determined by the existence or non-existence of legal authority for the arrest, and not by the information of the offender.

Applying these principles to the particular case at bar, we make the following deductions : —

1. If George Alford, the appellant, believed, and had reasonable ground for such belief, at the time he came to the rescue of his brother, that the latter was unlawfully arrested, — that is, arrested without lawful authority, — and that the life or person of his brother was

in immediate serious danger by means of such arrest, and by reason thereof he contributed by act or word to the death of the deceased, and the acts done by the appellant and his confederates were necessary to secure the release of Thomas Alford, and without a resort to such extremity the release of the latter could not have been effected, and the deceased had not in fact any lawful authority for such arrest, then the homicide was in law justifiable.

2. If the appellant and his confederates came to the rescue of Thomas Alford, believing, and having cause for such belief, that the latter had been arrested without authority of law, and with the purpose of effecting his release by all means in their power, not amounting to the homicide or serious injury of the deceased, and upon reaching the scene they were violently resisted and assaulted by the deceased, in such a manner as to endanger their lives or persons, and the deceased was killed in the *mêlée*, and had in fact no authority in law to make the arrest, then the homicide would be alike justifiable.

3. Or if the deceased seized upon the person of Thomas Alford without lawful authority, and accompanied the arrest with acts of unnecessary harshness and cruelty, calculated in their nature to aggravate and humiliate the latter, and by reason whereof the said Thomas Alford was incited to resistance, in which resistance the appellant joined, and which culminated in the slaying of the deceased, then the offence imputable to either could not be more culpable than manslaughter, and might be altogether justifiable, according to the nature and severity of the aggravation.

4. If, upon being informed of the arrest, the appellant, under the immediate influence of sudden passion, rushed to the rescue in company with others, and, meeting with resistance in the attempt at such rescue, slew the deceased, and such arrest was without authority of law, then the cause was adequate and the offence manslaughter. If the arrest had been made by virtue of lawful authority, the offence

would be murder; for he who resists arrest, or interferes in behalf of another under arrest, does so at his peril, and must abide the consequences in case it is ascertained that he has interfered with the due execution and enforcement of the laws.

Manifestly, a theory of the law not in consonance with the principles herein enunciated prevailed upon the trial of this cause in the court below; by reason whereof the judgment is reversed and the cause remanded.

*Reversed and remanded.*